SALOMENA KUROPATA, PETITIONER-PROSECUTRIX, v. NATIONAL SUGAR REFINING COMPANY, RESPONDENT.

Submitted October 1, 1940—Decided January 16, 1941.

Before BROGAN, CHIEF JUSTICE, and Justices PARKER and PERSKIE.

For the prosecutrix, *George A. Henderson.*

For the respondent, *McCarter, English & Egner (John J. Breslin, Jr.,* of counsel).

The opinion of the court was delivered by

PERSKIE, J.   The single question requiring decision in this workmen's compensation case is whether, as petitioner claims, decedent's death was the result of an accident (an electric shock) arising out of and in the course of his employment, or whether, as respondent claims, decedent's death was the result of natural causes (coronary occlusion and sclerosis) not in anywise connected with the decedent's employment.

Frank Kuropata, a man forty-one years of age, had been employed by respondent company for twenty-three years as a laborer and general workman in and about its plant. He had, according to the testimony of petitioner (his wife since 1927), enjoyed excellent health all during their married life, never having consulted a doctor.

On Sunday, August 8th, 1937, about two-thirty in the afternoon, Kuropata, along with two fellow workmen, was engaged in the cleaning of a vat, about eight feet square and eight feet in height. Decedent had been working for about two or two and one-half hours inside the vat with one of the other workmen. His work consisted of removing the dirt that had collected between and around the coils at the bottom of the vat and of placing the same into pails. These pails were taken away by a third workman who was stationed on the platform outside the vat. To furnish additional light inside the vat an extension cord had been hung from a beam placed over the top of the vat. At the completion of his work, decedent, apparently intending to hand the cord to the workman outside the vat, reached upward and grasped the cord with his left hand. While his hand was on the cord, he uttered some exclamation, collapsed and fell on some of the hot steam pipes located inside the vat. He suffered burns on his face, right hand and forearm. One of the other workmen shouted to a third man to disconnect the electric cord extension— which was done. Fellow workmen then took decedent, who was unconscious, out of the vat and carried him to one of respondent's char houses. The workmen assumed that decedent had suffered an electric shock and a call was made to the police. An emergency crew of police and firemen was dispatched. When Dr. H. D'Agostin arrived, a few minutes later, he found a gas mask strapped to decedent's face and either policemen or firemen (he was not certain as to which) were administering artificial respiration. He found that the whole upper part of decedent's face was "deeply cyanotic," i. e., ashen blue; and he found "second degree burns on his face and on his right forearm." Although Dr. D'Agostin was of the opinion that decedent was dead before he (the doctor) had arrived, he intraveinously injected into decedent

"coramine, caffein and sodium benzoate" and continued with the artificial respiration, but without avail.

Dr. Greenfield, assistant county physician, at first also "thought that decedent had been electrocuted," and, apparently so stated in the first death certificate issued. He, however, changed his mind. For said he, after "further question and further history of the case, his feeling was such that it [decedent's death] didn't seem like electrocution and that is why the autopsy was ordered [by Dr. D'Agostin] and we proceeded to do it."

The autopsy was performed by Dr. Greenfield the day following decedent's death. Dr. Greenfield then made out the only death certificate now before us which states the principal cause of death to be "coronary sclerosis and occlusion," with a question mark inserted in the column entitled "date of onset." Chronic myocarditis was listed as a contributory cause of importance.

Petitioner sought compensation on the theory that decedent, her husband, died "while working in the tank at char house, suffered electric shock, severe burns, crashed against several steam coils and was electrocuted　＊　＊　＊."

Respondent, relying on the facts disclosed by the autopsy, answered that decedent suffered "no accident" but that he died as the result of natural causes (coronary occlusion and sclerosis) "not in any way connected with decedent's employment."

In a word, the issue clearly raised was whether decedent's death was the result of electrocution or the result of a heart condition.

The Workmen's Compensation Bureau determined that decedent's fall was the result of a heart condition which caused his death and not from electrocution as alleged in the petition. *Kuropata* v. *National Sugar Refining Co.,* 16 *N. J. Mis. R.* 383; 199 *Atl. Rep.* 897.

On appeal to the Bergen County Court of Common Pleas, that court, opinion by Judge Del Mar, affirmed the bureau.

A writ of *certiorari* was granted petitioner.

We proceed with our duty of appraising the proofs, notwithstanding that the bureau and the Pleas were in accord,

to the end of making an independent determination as to whether petitioner carried the burden of establishing, by a preponderance of probabilities, the bases upon which she asserted her right to compensation (*Cf. Gilbert* v. *Gilbert Machine Works, Inc.*, 122 *N. J. L.* 533; 6 *Atl. Rep.* (*2d*) 243), or as it is otherwise stated, we proceed with our duty independently to determine whether petitioner has proved facts from which may be deduced proper inferences sufficient to form a rational basis for the finding that decedent's death was the result of an accident arising out of and in the course of his employment. *Cf. Calicchio* v. *Jersey City Stock Yards Co.*, 125 *N. J. L.* 112, 117, 118; 14 *Atl. Rep.* (*2d*) 465.

In stating the results of his autopsy, Dr. Greenfield testified that in his opinion he found no evidence of electrocution and that the decedent "died purely from a heart condition." He pointed out that "The heart was opened up and the aortic ring showed advanced sclerosis, bone-like in character. * * * both coronaries were opened and dissected out. They were pipe-stem and showed total sclerosis, bone-like in character throughout, with almost total occlusion in numerous different arteries." He also testified that the condition of decedent's spleen was such as "is found usually in a case of chronic cardiac decompensation, where you have a continued condition * * * over a long period of time, the spleen would become enlarged and less than normal consistency."

Dr. D'Agostin, employed by respondent while its regular physician was on vacation, was also present at the autopsy. He, too, was of the opinion that decedent died from a heart condition. He especially pointed out that he had administered aid to decedent for at least *two and one-half hours* and that rigor mortis had not, as yet, set in, while petitioner's own witness, Dr. Haskell, testified, on direct examination, that "the stiffness of death, what we call rigor mortis, comes on from twelve to forty-eight hours, whereas *in electrocution, it comes on in twelve minutes, the longest.*"

Dr. Haskell, Dr. Weisler and Dr. O'Grady, all called by petitioner, testified that a cyanotic or blue or ashen appearance would not be found after death by electrocution but

would be found after death resulting from a heart condition. Dr. D'Agostin, who, as we have seen, arrived on the scene immediately after the occurrence, testified that the "whole upper part of his body, the head, face, neck and shoulders were deeply cyanotic." Dr. Greenfield likewise testified that the appearance of decedent's face was "cyanotic; he had a post-mortem cyanosis." The undertaker, Wm. J. Slominske, testified that decedent's "face was very dark." Nathan R. Andrews, an electrical engineer in respondent's employ, who arrived on the scene immediately after the occurrence, testified that decedent "had a dark color on his face and arms * * * his face was dark—his face was not red." Anthony Cizak, the fellow workman who had been working inside the vat with decedent shortly prior to the time when the occurrence happened, and who aided in carrying decedent out of the vat, testified that decedent's "face was black."

The only testimony to the effect that decedent's face was red, rather than cyanotic, was given by William Kulrscz, a fellow workman. Kulrscz testified that decedent was preparing to hand the lamp to him when he (decedent) "Stay funny. He was red like a fire." The testimony of this witness is confused throughout. He had difficulty in speaking and understanding English and an interpreter was finally used. His confused testimony is not persuasive.

The wire socket from which it is claimed that decedent received a shock was identified at the hearing by John Coleman, a policeman who was dispatched to the scene. Coleman had formerly been an electrician and had tested the wire at headquarters for "shorts and grounds." He found it to be "in working order" and "in safe order." A piece of tape wound over the wire above the socket, he testified, had been put there to hold the socket steady—there being perfect wiring under it.

Lieutenant Flannery testified that the wire tested at the station house disclosed a "short" after the tape was removed and that the wire introduced at the hearing was not the same one that had been tested. Flannery, however, had never had any electrical experience and he himself stated that he did not know whether the cord had been tested at respondent's plant

because he "didn't know enough about it." In addition, he testified that before the tape was removed, "They tested the cord and the cord tested right." Thus, even if we were inclined to adopt the version of Lieutenant Flannery, it is clear that no "short" existed at the time decedent's hand came into contact with the extension cord since the evidence is plenary that the tape was present at that time.

Anthony Cizak, a fellow workman who had hung the extension cord down into the vat, testified that prior to the occurrence here involved, he had received a shock in hanging the very cord. The testimony of this witness, however, becomes extremely doubtful in view of his failure to mention this fact to anyone at the time. Moreover, John Burneikis, a fellow workman, testified that he had unscrewed the extension cord immediately after the decedent had collapsed. Although Burneikis wore no rubber gloves, he did not suffer a shock.

In addition, Lieutenant Flannery, Lieutenant Pickering, William J. Slominske, the undertaker, Dr. D'Agostin and Dr. Greenfield, all testified that there were no burns on decedent's left hand. Both Dr. D'Agostin and Dr. Greenfield testified that there were no burns on decedent's feet and that those burns which he did sustain were not of the type that one might receive from electricity, but were of the type that one might receive from steam pipes. To further substantiate that the burns on decedent's body resulted from his contact with the hot steam pipes, John Burneikis, the man who lifted decedent from inside the vat, testified that his head and arms were lying on two pipes. Lieutenant Flannery stated that he went into the vat and found heat in the coils.

True, in answer to hypothetical questions, Dr. Haskell, Dr. Weisler and Dr. O'Grady were unanimous to the effect that, on the facts given them in the questions, death resulted from electrocution. But it is equally true that the facts given in these questions did not accurately include all of the circumstances as they actually occurred. The questions were asked before all the testimony was disclosed and the doctors were asked to assume facts that were later proved to be untrue. For examples, contrary to the assumption in these

hypothetical questions, decedent's appearance, after death, was cyanotic and not red. Nor was it pointed out to the doctors that the burns found upon decedent's body were not those of the type that result from electric shock. Nor were the doctors told that rigor mortis had failed to set in for at least two and one-half hours after death.

A more accurate hypothetical question was put to Dr. Blumberg, a neurologist connected with the Department of Labor, who handled approximately sixty to seventy electric shock cases in a year. Dr. Blumberg responded that "There is nothing in this picture to indicate that electricity had anything to do whatever with his death."

Now there is proof that decedent's body was moist from perspiration at the time he took hold of the cord. How, if at all, does this circumstance support petitioner's claim? One of petitioner's witnesses, Nelson Kieb, an electrical engineer, testified: "If the moisture is sufficient to reach one of the conductors, then the moisture itself will carry a current from that conductor, and if another portion of the body of the person handling the cord should come into contact with the ground, so that there would be a circuit from the live conductor, through the body to the ground, there would be the effect of an electrocution." He also testified: "If the moisture would reach the live conductor through some way—anyway at all—there is a possibility of the current being carried through the body."

This testimony does not support petitioner's claim. First, we base our determination on "probabilities" and not "possibilities." Secondly, there is not a scintilla of proof that moisture did in fact reach the live conductors. Thirdly, the claim or theory that decedent died from electrocution was completely exploded. We so hold.

Since decedent was afflicted with a heart condition prior to his death, the question still remains whether petitioner established by proper proofs that decedent suffered an "accidental" strain of his heart—that is, did petitioner properly prove that decedent suffered a compensable accident, one which arose out of his employment? *Bernstein Furniture Co.* v. *Kelly* (*Supreme Court*), 114 *N. J. L.* 500; 177 *Atl.*

*Rep.* 554; *affirmed*, 115 *N. J. L.* 500; 180 *Atl. Rep.* 832; *Hentz* v. *Janssen Dairy Corp.* (*Court of Errors and Appeals*), 122 *N. J. L.* 494; 6 *Atl. Rep.* (*2d*) 402. There was no proof that decedent's work called for unusual strain, effort or exertion, or that decedent's work (under the English cases referred to in the *Hentz* case) helped or hastened his death in any material degree. Nor was there any proof of a causal connection between decedent's work and his death. Nor was there any proof that but for decedent's employment his death would not have resulted. *Cf. Bollinger* v. *Wagaraw Building Supply Co.*, 122 *N. J. L.* 513, 520; 6 *Atl. Rep.* (*2d*) 396; *Ciocca* v. *National Sugar Refining Company of New Jersey* (*Court of Errors and Appeals*), 124 *N. J. L.* 333, 334; 12 *Atl. Rep.* (*2d*) 130.

In fine, we, too, hold that petitioner did not carry the burden of establishing, as alleged, that her husband died as the result of an accident arising out of and in the course of his employment.

The writ is discharged.